UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MARISA HOLMES,                                    )
                                                  )
                              Plaintiff,          )
                                                  )
        -against-                                 )        **14 Civ. 5253 (LTS)**
                                                  )
THE CITY OF NEW YORK; POLICE                      )
DETECTIVE KENNETH ODONNELL, Shield No.)
7432; POLICE DEPUTY INSPECTOR                     )
ANTHONY BOLOGNA; POLICE OFFICER                   )
FERNANDO CENTENOTALAVERA, Shield No. )
21642; JOHN DOES; and RICHARD ROES,               )
                                                  )
                              Defendants.         )
------------------------------------------------------------------X


## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS


Jeffrey A. Rothman, Esq.
315 Broadway, Suite 200
New York, New York 10007
(212) 227-2980

Attorney for Plaintiff Marissa Holmes

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ iii

Preliminary Statement ...........................................................................................1

I.      STATEMENT OF FACTS ............................................................................ 1

II.     ARGUMENT .............................................................................................. 1

        A.      12(b)(6) / 12 (c) standard ............................................................ 1

        B.      Defendants Improperly Seek To Rely On Video Evidence In
              Their Motion To Dismiss …........................................................... 3

        C.      Plaintiff has Stated Claims for False Arrest and Malicious
              Prosecution, and for First Amendment Retaliation, and
              Defendants are not Eligible for Qualified Immunity.................................. 8

        D.      Concerning Defendants' Remaining Arguments ..................................... 22

CONCLUSION ..................................................................................... 26

TABLE OF AUTHORITIES

Adickes v. Kress & Co., 398 U.S. 144(1970) ........................................................ 18

Ashcroft v. Iqbal, 129 S.Ct 1937 (2009) …………………………………………... 1

Baker v. Latham Sparrowbush Associates, 808 F.Supp. 981 (SDNY, 1992)…… 2

Bell Atl Corp. v. Twombly, 550 U.S. 544 (2007) ……………………………..  1, 2

Bloch v. Ribar, 156 F.3d 673 (6th Cir. 1998) …………………………………….. 17

Blue Tree Hotels Inv. v. Starwood Hotels & Resorts,
369 F.3d 212 (2d Cir. 2004) …………………………………………………….....  3

Brodeur v. City of New York, 2002 U.S. Dist. LEXIS 4500 (SDNY) .................  1

Burg v. Gosselin, 591 F.3d 95 (2d Cir. 2010) ……………………………………. 21

Castilla v. City of New York,
2011 U.S. Dist. LEXIS 95619 (S.D.N.Y. 2011) …………………………………. 25

Castilla v. City of New York,
2011 U.S. Dist. LEXIS 95619 (S.D.N.Y. 2011) …………………………………. 24

Chambers v. Time Warner, Inc., 282 F.3d 147 (2d Cir. 2002) …………………… 4

City of Houston v. Hill, 482 U.S. 451 (1987) ……………………………………. 13

Coggins v. Buonora, 776 F.3d 108 (2d Cir. 2015) ………………………………. 16

Cook v. Sheldon, 41 F.3d 73 (2d Cir. 1994) …………………………………….. 22

Davis v. City of New York, 373 F.Supp.2d 322 (S.D.N.Y. 2005) ……………….. 16

DiFolco v. MSNBC Cable LLC, 622 F.3d 104 (2d Cir. 2010) ………………  2, 4, 7

Faulkner v. Beer, 463 F.3d 130 (2d Cir. 2006) ………………………………….4

Garcia v. Doe,
779 F.3d 84 (2d Cir. 2014, Opinion amended February 23, 2015) ……………... 5

Groh v. Ramirez, 540 U.S. 551 (2004) ……………………………………………. 14

Harlow v. Fitzgerald, 457 U.S. 800 (1982) ……………………………………….. 15

Hervey v. Estes, 65 F.3d 784 (9th Cir.1995) ………….………………………….. 16

Hershey v. Goldstein,
938 F.Supp.2d 491 (S.D.N.Y. 2013) (Englemayer, J.) …………...…………… 16, 23

Higginbotham v. City of New York, et al.,
2015 WL 2212242 (S.D.N.Y. May 12, 2015) (Castel, J.) ………....…….….. 12-14, 16

Jenkins v. City of New York, 478 F.3d 76 (2d Cir. 2007) ……………………….. 16

Lippay v. Christos, 996 F.2d 1490 (3d Cir. 1993) ……………………………….. 16

Matter of Anthony B., 201 A.D.2d 725 (2d Dept. 1994) ………………………… 20

Nogbou v. Mayrose, 400 Fed.Appx. 617 (2d Cir. 2010) ………………………… 2

Palmer v. Richards, 364 F.3d 60 (2d Cir. 2004) …………………………………. 14

Parker v. City of Long Beach, 2014 U.S. App. LEXIS 7346 (2d Cir.) .................... 2

People v. Benjamin, 185 Misc. 2d 466 (Crim. Ct. Bronx County 2000) ………… 13

People v Dipoumbi, 23 Misc. 3d 1127[A] (Crim. Ct., Bronx County 2009) …….. 19

People v. Gonzalez (NY Ct. of Appeals, June 25, 2015) ………………………… 10

People v. Jones, 9 N.Y.3d 259 (2007) ……………………………………………. 10

People v. Lupinacci, 595 N.Y.S.2d 76 (2d Dept. 1993) ………………………….. 20

People v. Greene, 221 A.D.2d 559 (2d Dept. 1995) ……………………………. 20

People v. Munafo, 50 N.Y.2d 326 (1980) ………………………………………… 9

People v. Simon, 145 Misc. 2d 518 (Crim. Ct., Bronx County 1989) …………… 19

People v. Vogel, 116 Misc 2d 332 (App. Term, 2d Dept. 1994) …….…………… 20

Phelps v. City of New York,
2006 U.S. Dist. LEXIS 42926 (S.D.N.Y. 2006) (Cote, J.) …………….………… 22

Posr v. Doherty, 944 F.2d 91 (2d Cir. 1991) …………………………………… 21

Riccuti v. New York City Transit Authority, 124 F.3d 123 (2d Cir. 1997) ……… 16

Shepherd v. Powers, 55 F.Supp.3d 508 (S.D.N.Y. 2014) (Swain, J.) …………… 25

Swartz v. Insogna, 704 F.3d 105 (2d Cir. 2013) …………………………………… 21

Tellier v. Fields, 280 F.3d 69 (2d Cir. 2000) …………………………………….. 14

Tolan v. Cotton, 134 S. Ct. 1861 (2014) ………………………….....................  2

Wright v. Smith, 21 F.3d 496 (2d Cir. 1994) …………………………………….. 14

<u>PRELIMINARY STATEMENT</u>

This memorandum is respectfully submitted on behalf of plaintiff Marissa Holmes in opposition to Defendants' Motion to Dismiss.  Plaintiff has sufficiently alleged violation of her rights as secured by the United States Constitution and 42 U.S.C. § 1983.  A reasonable reading of the facts alleged in the Amended Complaint (hereafter "AC"), taken as true for purposes of the determination of Defendants' motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6) / 12(c), indicates that the Defendants violated Plaintiff's rights under 42 U.S.C. § 1983.  There is already significant evidence indicative of this, as set forth in the detailed Amended Complaint, and Plaintiff is entitled to the opportunity to seek further evidence through discovery in order to further prove these allegations, and is entitled to have a jury rule upon issues of credibility that can only be determined by that ultimate fact finder.

**I.    STATEMENT OF FACTS**

The relevant facts underlying this motion are set forth in the detailed Amended Complaint. Particular relevant facts are discussed below in the context of Plaintiff's argument.

**II.    ARGUMENT**

**A.    <u>12(b)(6) / 12(c) Standard</u>**

On a motion to dismiss under Rule 12(b)(6), "a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor." <u>Brodeur v. City of New York</u>, 2002 U.S. Dist. LEXIS 4500 (SDNY) at *6 (internal citations omitted).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 129 S.Ct 1937, 1949 (2009) (quoting <u>Bell Atl Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  This

1

standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.[1]

The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 113 (2d Cir. 2010) (citation omitted). The motion should be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Nogbou v. Mayrose, 400 Fed.Appx. 617, 619 (2d Cir. 2010) (citation omitted). The Court's task and analysis on a Rule 12(c) motion is identical to that on a Rule 12(b)(6) motion. Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001).

"Under the Federal Rules, a plaintiff need only plead 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Baker v. Latham Sparrowbush Associates, 808 F.Supp. 981, 989 (SDNY, 1992) (citing Fed.R.Civ.P. 8(a)). See also, Fed.R.Civ.P. 8(e) ("Pleadings must be construed so as to do justice.").

---

1 In Tolan v. Cotton, 134 S. Ct. 1861 (2014), in the related context of summary judgment motions, the Supreme Court recently emphasized the "importance of drawing inferences in favor of the nonmovant," and that "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." Id. at 1866. "By weighing the evidence and reaching factual inferences contrary to [Plaintiffs'] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." Id. at 1868; see also Parker v. City of Long Beach, 2014 U.S. App. LEXIS 7346 *3 (2d Cir.) (Amended Summary Order) ("Absent incontrovertible evidence 'utterly discredit[ing]' Parker's position, Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007), the district court was required to view the evidence in the light most favorable to Parker and to draw all reasonable inferences and resolve all ambiguities in Parker's favor, see Grain Traders, Inc. v. Citibank, N.A., 160 F.3d 97, 100 (2d Cir. 1998).") These principles, of course, apply a fortiori in adjudicating motions to dismiss under Fed.R.Civ.P. 12(b)(6) / 12 (c), where full discovery has not even taken place.

B.     <u>**Defendants Improperly Seek To Rely On Video Evidence In Their Motion To
Dismiss**</u>

Defendants improperly focus their motion to dismiss around video footage that is not
referred to in the Amended Complaint (although the fact that Plaintiff was filming as a
professional journalist when she was arrested is, of course, discussed).  Even more inappropriate,
and bizarre, Defendants also seek to base their motion on further video footage by a non-party
witness that they themselves referenced in their Answer to the original Complaint – and that is not
mentioned in any way in the Complaint or Amended Complaint – and then argue that such
material is properly considered on a motion to dismiss because <u>they</u> included it in <u>their</u> pleading.
Plaintiff is not at all afraid of these materials and, as explained below, believes they inure to her
benefit, and intends to rely on them herself in the future, either at the summary judgment stage or
at trial.  But there is a proper way for evidence to be considered in civil litigation, and that is for it
to be considered in its full context after both sides have an opportunity for discovery.  The Court
should reject Defendants' improper attempts to rely upon the video evidence on the instant
motion.

Concerning the video that was taken by Plaintiff, it was not "incorporated into the
Complaint by reference" such that it should be considered on the instant motion.  *See,* <u>Blue Tree
Hotels Inv. v. Starwood Hotels & Resorts</u>, 369 F.3d 212, 217 (2d Cir. 2004) (permitting
consideration of "any documents that are either incorporated into the complaint by reference or
attached to the complaint as exhibits").  The fact that Plaintiff was arrested while filming as a
journalist was, of course, discussed throughout the Amended Complaint, but the video footage

Plaintiff took was, in fact, not mentioned at all[2].  In fact, the only video footage that was

incorporated by reference into the Complaint was footage of another Occupy Wall Street

("OWS") incident that occurred later the same day, which depicts Defendant Bologna unlawfully

pepper-spraying two women who are plaintiffs in another lawsuit (AC ¶46).

While there *may* be (which itself has never been decided by the Second Circuit) times

when the Court can consider video evidence on a motion to dismiss, those circumstances are rare

indeed, and are limited to circumstances where the video evidence was clearly incorporated into a

---

2 Plaintiff did use various videos as sources - along with a number of other sources - for a number
of the allegations that were made in the Amended Complaint, but that does not incorporate the
video footage by reference, as the video footage of the incident itself was never even mentioned,
nor make the video footage "integral" to the Amended Complaint.  When a Plaintiff makes an
allegation in a Complaint, the Defendants do not then get to speculate that a particular
"document" (be it a paper or electronic document, a video or audio file, a painting, or otherwise)
was the source for that allegation, and then base a motion to dismiss upon that document by
arguing that - although the "document" was unmentioned by the Plaintiff in the Plaintiff's pleading
- the unmentioned document (which the defendants surmise that they have correctly identified)
was incorporated into the Complaint by reference.  Defendants also cite (MOL p. 4) to Chambers
v. Time Warner, Inc., 282 F.3d 147 (2d Cir. 2002) and DiFolco v. MSNBC, 622 F.3d 104 (2d
Cir. 2010) for the proposition that a court may consider documents on a motion to dismiss
"where the complaint relies heavily on its terms and effect, thereby rendering the document
integral to the complaint."  DiFolco at 111 (internal quotations omitted).  But these decisions (and
others like them discussing the propriety of relying on documents as "integral" to a Complaint)
were rendered in commercial cases wherein contracts and financial documents are at the very
center of the legal dispute.  The video material that Defendants seek to rely upon on the instant
motion are not "integral" to Plaintiff's complaint, and Plaintiff further submits that there are, at
this stage of the case, "material disputed issues of fact regarding the relevance of the
document[s]" which preclude their use on the instant motion.  Id., quoting Faulkner v. Beer, 463
F.3d 130, 134 (2d Cir. 2006).  There are material disputed issues of fact regarding the relevance
of the various fragments of video footage that the Defendants seek to extract from the full context
of the event and rely upon on the instant motion.  The various video clips, unmentioned in
Plaintiff's Amended Complaint, will be – down the road at summary judgment and / or at trial –
important pieces of evidence, but pieces nonetheless, that will be considered in conjunction with
witness testimony, police documents, transcripts from other proceedings, etc., from which the
events that transpired during the incident will be gleaned and understood in their full context by
the factfinder.

Complaint and is so clear as to what occurred that the Court can decide the case as a matter of

law without the need for discovery to elucidate the meaning and context of what is depicted on

the video.  Thus, in <u>Garcia v. Doe</u>, 779 F.3d 84 (2d Cir. 2014, Opinion amended February 23,

2015), in which "Plaintiffs attached five video excerpts and nine still photographs as exhibits to

the Second Amended Complaint," <u>Id</u>. at 87, the Circuit determined that the video evidence[3]

depicting the circumstances of hundreds of protestors taking over the vehicular traffic lanes of the

Brooklyn Bridge was sufficient at the motion to dismiss stage to entitle the individual police

defendants to qualified immunity for the mass arrests made in that case.  But the Plaintiff in this

case did not attach any video footage to the Complaint or Amended Complaint, and did not

reference the footage, and the facts of the instant case are a far cry from those of <u>Garcia</u>.

In the instant case (as further elaborated below) Plaintiff, a professional journalist (AC ¶¶

10, 26), was present for a political demonstration during which a single person kneeled down in a

roadway that had been, and was, closed to vehicular traffic (AC ¶¶ 39-44) and began to give a

political / economic oration against a bank (AC ¶¶ 9-11). The roadway was filled with police,

demonstrators, and other journalists, the police did not (until the orator was being arrested) ask

people to get out of the roadway, and the Plaintiff had, a short time prior to her arrest, cooperated

---

3 The Circuit panel in <u>Garcia</u> noted that "[w]e have never addressed whether Fed.R.Civ.P. 10(c),
which provides that a 'written instrument' included as an exhibit to a pleading 'is a part of the
pleading for all purposes,' extends to videos of the sort presented in this case.  Because no party
contests the inclusion of the videos in the Court's review of the Complaint, however, we have no
occasion to reach that issue here."  <u>Id</u>. at 87, fn 2.  The inclusion of the video footage in the
Court's review of the Amended Complaint on the instant motion is indeed contested, however,
and Plaintiff submits that video footage is not appropriately considered as a "written instrument"
under Fed.R.Civ.P. 10(c), and that District Courts should not be engaged in analyzing video
evidence on a motion to dismiss under any circumstances (absent consent of all parties).  This is
especially so where, as here, the video footage in question was neither attached as an exhibit to,
nor incorporated by reference in, the Complaint (or Amended Complaint).

with a request from a police officer to step back, and been thanked by that officer for cooperating

with him (AC ¶¶ 12-15).  Only when the police began to arrest the orator - at that critical

journalistic juncture - did it suddenly become imperative to Detective O'Donnell that Plaintiff get

out of the roadway and stop filming (AC ¶¶ 16-18).  Despite the illegality of Det. O'Donnell's

directive and conduct (*e.g.*, AC ¶¶ 64-68), and the fact that he was specifically targeting Plaintiff

and attempting to block her from filming (AC ¶¶ 17-22), Plaintiff still was attempting to comply

with the directive, and was filming the orator's arrest as she headed toward the sidewalk, which

was where the police were taking the arrested orator (AC ¶¶ 19, 24-25), when she was arrested

on a pretext, and subjected to excessive force (AC ¶¶ 26-30, 63-64).

It may be - after the various players depicted on the various videos[4] and otherwise

identified in discovery are deposed in this matter - that it will require a jury[5] to determine whether

Defendant O'Donnell was attempting to target Plaintiff and interfere with her filming, and

whether a reasonable officer in his (or Defendant Bologna's) position should have realized that

she was not violating any law, and whether she was subjected to excessive force by the large,

---

4 There is, additionally, further video footage of the scene of the incident that was taken by
multiple members of the NYPD's TARU (Technical Assistance Response Unit) that has been
identified by Defendants in their Initial Disclosures and their responses to Plaintiff's
interrogatories and document requests, that Defendants have not yet turned over to Plaintiff in
discovery.  There will likely also be numerous other documents that Defendants will need to
disclose in discovery that will shed further light on what transpired during the incident.  None of
the depositions of the various videographers – or the other witnesses – have yet been taken.  If
the Court decides to view the video footage that Defendants submitted in support of the instant
motion, the Court will also see that numerous other people were filming and photographing at the
time and place of the incident, and those further videos and photos may also be obtained (and
depositions of those videographers / photographers and other civilians present taken) during the
course of discovery in this action.

5 Plaintiff, of course, may move for summary judgment following discovery in this matter, should
the evidence warrant same.

male officers, and the like.  It will be necessary for a jury to make the requisite credibility

determinations, and to draw what inferences they will from the parties' respective testimonies, and

other evidence, to be eventually presented at trial.  What is clear, however, is that at this stage of

the case - without an elucidation through discovery of the meaning and context of what is seen on

the video footage - the video evidence cannot be considered as dispositive of any of these issues.

Defendants' argument on page 6 of their Memorandum of Law ("MOL") that the video

footage is properly considered because they "included the video as part of their answer" is simply

absurd, and would turn the standard for a motion to dismiss entirely on its head.  If Plaintiff were

the one making a motion for judgment on the pleadings under Rule 12(c), then in that

circumstance the Defendants could rely on the facts stated, and documents incorporated by

reference, in their Answer.  The facts (and inferences to be drawn therefrom) on a Rule 12(b)(6)

or 12(c) motion are to be construed in the light most favorable to the non-moving party, however,

and the motion must, of course, be adjudicated based upon the non-moving party's pleading.

Defendants are, in essence, attempting to bring a summary judgment motion that is

masquerading as a motion on the pleadings.  This is improper, and the case at bar cannot be

resolved on the pleadings.  The task of the court in ruling on a Rule 12(b)(6) / 12 (c) motion is

"merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence

which might be offered in support thereof."  DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 113

(2d Cir. 2010) (citation omitted).  Plaintiff submits that after discovery is taken, either the Plaintiff

or Defendants may wish to bring a summary judgment motion as to some or all of the claims in

this case.  Discovery in this case, however, is necessary to flesh out and understand the full

context and meaning of what transpired on the date of the incident.  Based, however, on the detailed facts alleged in the Amended Complaint, and the inferences to be drawn therefrom - viewed in the light most favorable to Plaintiff, as they must be on a motion to dismiss - it is clear that the Defendants' instant motion must be denied.

C.     **Plaintiff has Stated Claims for False Arrest and Malicious Prosecution, and for First Amendment Retaliation, and Defendants are not Eligible for Qualified Immunity**

Plaintiff has amply pled claims for false arrest and malicious prosecution, and for First Amendment Retaliation.  The detailed facts in the Amended Complaint – and the inferences to be drawn therefrom – taken in the light most favorable to the Plaintiff, indicate plainly that there was not probable cause to arrest Plaintiff for violation of any provision of the New York State Penal Law, that the Defendants were seeking to (and did) interfere with and retaliate for Plaintiff's attempt to film the arrest of the orator, and that the Defendants are ineligible to invoke the affirmative defense of qualified immunity.  Plaintiff addresses her First Amendment Retaliation Claim, and the qualified immunity issue, in conjunction with her discussion of the sections of the Penal Law that Defendants seek to rely on to justify her arrest.

The Disorderly Conduct statute contains an important scienter requirement which the Defendants disregard.  With regard to all of its various subsections, in order to violate the statute, one must commit the requisite offensive conduct "with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof …."  At this level alone Defendants' motion fails.  The Amended Complaint alleges that Plaintiff was working as a journalist, and was being cooperative with the police on the date of the incident, and that she had acceded to a police

officer's request to step back, and was thanked by that officer for her cooperation a short time prior to her arrest.  It also makes clear that despite the fact that she was specifically targeted by Det. O'Donnell - who unlawfully tried to block her from filming and directed her to stop filming, and ordered her to leave a roadway that had been closed to vehicular traffic - she *still* tried to comply with his directive and move to the sidewalk.  The allegations in the Amended Complaint plainly support the inference that Plaintiff was not intentionally causing, or recklessly creating a risk of, public inconvenience, annoyance, or alarm.  The inference to be drawn is precisely the opposite: that a professional journalist was simply trying to film a newsworthy event in as unobtrusive a manner as possible, and was also trying cooperate with the police (but without being prevented from being a journalist and capturing the newsworthy event). Det. O'Donnell's honing in and focusing specifically on Plaintiff (including his accidental slip of the tongue and calling her by her first name, AC ¶ 22), and sudden purported need to immediately have her leave the roadway just as she was trying to film the arrest of the orator, indicates the pre-textual nature of his directives to her, and the unlawful arrest that he made based thereon.  The inferences to be drawn from Plaintiff's interactions with Det. O'Donnell and her conduct in response thereto indicate that he was attempting to (and did) interfere with her filming, and to falsely arrest and prosecute her, not that she was intentionally causing, or recklessly creating a risk of, public inconvenience, annoyance, or alarm.

Defendants also ignore that the disorderly conduct statute requires a public dimension to the offensive conduct, and that the private dispute between Plaintiff and Det. O'Donnell (which, to the extent there was one, he created) does not fall within the ambit of the statute for that reason as well.  *See*, e.g., People v. Munafo, 50 N.Y.2d 326, 331, (1980):

Indeed, a requirement that the disruptive behavior proscribed by our disorderly conduct statute be of public rather than individual dimension was evolving even before subdivision 2 of section 722 of the former Penal Law was replaced by the present section 240.20. The clear aim was to reserve the disorderly conduct statute for situations that carried beyond the concern of individual disputants to a point where they had become a potential or immediate public problem. In deciding whether an act carries public ramifications, courts are constrained to assess the nature and number of those attracted, taking into account the surrounding circumstances, including, of course, the time and the place of the episode under scrutiny.

(Citations omitted.)  This bedrock aspect of the disorderly conduct statute was reiterated by the

New York Court of Appeals just yesterday.  *See*, People v. Gonzalez, (June 25, 2015)[6], which

involved a man who was "shouting obscenities at police officers in a subway station":

Here, however, there is no record support for the motion court's determination that defendant's rant against the police officers constituted the crime of disorderly conduct. "'[A] person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem'" (People v Baker, 20 NY3d 354, 359-360 [2013]), quoting People v Weaver, 16 NY3d 123, 128 [2011]).

Defendants also attempt to conflate the scienter (mens rea) element of the disorderly

conduct statute with the substantive element underlying subsection 5, which requires, in addition

to having the necessary mens rea, causing an <u>actual</u> (not potential) obstruction of vehicular or

pedestrian traffic, and requires the obstruction to more than merely momentary or inconvenient.

*See*, People v. Jones, 9 N.Y.3d 259, 262-263 (2007):

To meet the jurisdictional requisite to prosecute defendant for disorderly conduct under Penal Law § 240.20 (5), the People were obliged to set forth a prima facie case that defendant "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . obstruct[ed] vehicular or pedestrian traffic."

---

6 The <u>Gonzalez</u> Slip Opinion is viewable on the New York Court of Appeals' website at
http://www.courts.state.ny.us/ctapps/Decisions/2015/Jun15/Jun15.htm

The allegations in the information do not meet this burden. Nothing in the information indicates how defendant, when he stood in the middle of a sidewalk at 2:01 A.M., had the intent to or recklessly created a risk of causing "public inconvenience, annoyance or alarm." The conduct sought to be deterred under the statute is "considerably more serious than the apparently innocent" conduct of defendant here (People v Carcel, 3 NY2d 327, 331, 144 NE2d 81, 165 NYS2d 113 [1957]). Something more than a mere inconvenience of pedestrians is required to support the charge (id. at 332). Otherwise, any person who happens to stop on a sidewalk--whether to greet another, to seek directions or simply to regain one's bearings--would be subject to prosecution under this statute (see People v Nixon, 248 NY 182, 185, 161 NE 463 [1928] [Those congregating on the street display "atrociously bad manners" [263] by "discommod(ing) some other persons" but such conduct alone does not necessarily give rise to disorderly conduct]).

As with pedestrian traffic, so too something more than a mere inconvenience to vehicular traffic is necessary to justify an arrest or prosecution under Penal Law § 240.20 (5), and everything about Plaintiff's conduct in this case appears to be the "apparently innocent" behavior of a journalist trying to simply film a newsworthy event without causing inconvenience, annoyance, or alarm to anyone.  Further, just as with the examples given by the Court of Appeals in Jones concerning pedestrian traffic, if unintentionally causing a momentary delay to a vehicle in the roadway would justify an arrest and prosecution under the statute, so would taking a few moments to remove a child from a car seat on a narrow street, moving a couch across a street into a U-Haul, pausing to pick up groceries or other items that had been accidentally dropped crossing the street, or any number of other things that might cause the driver of a vehicle to pause briefly, beep a horn, wait a moment until the way is clear, and then proceed on their way.

In a great "aha" moment, the Defendants – improperly seeking to rely on one of the video clips that they attached to their Answer to the original Complaint – point to footage in their Exhibit F that shows that there was a postal truck that was waiting briefly to proceed northward on Nassau Street in the vicinity of where the orator and Plaintiff had been arrested.  As an initial

matter, the roadway was at that time off-limits to vehicular traffic (AC ¶¶ 39-44).  Why the postal

vehicle was there and how it got there is unknown, and may become known through discovery:

*e.g.*, was its driver given some special dispensation by a member of the NYPD (or the New York

City Department of Transportation, or otherwise) from the otherwise applicable road closing?  Or

did it take a wrong turn, and wind up on a roadway where it should not have been driving?  In any

event, the postal vehicle experienced at most a brief period of inconvenience, if that, and then

continued on its way, which hardly qualifies as an obstruction of vehicular traffic that falls within

the ambit of the disorderly conduct statute.  It is also clear from the Defendants' Exhibit F (should

the Court conclude that it is properly considered on the instant motion) that it was the

*Defendants'* own illegal conduct - in falsely arresting Plaintiff as she headed out of the roadway,

and in pushing her down onto the roadway and arresting her - that prolonged her time in the

roadway.  If Defendants had just respected the First and Fourth Amendments and kept their hands

off of her, she would have been on the sidewalk (which she was right next to, and toward which

she was heading), within a matter of seconds.  Defendants also engage in rank speculation as to

the source of the "horn" (if that is indeed the source of the noise) that is heard on their Exhibit F,

and it appears that the sound that they are referring to as a horn is heard as Plaintiff is walked by

Defendants down the sidewalk in handcuffs following her arrest.

Plaintiff's arrest also cannot be justified under Penal Law § 240.20 (6), both because of

the same stark lack of the necessary scienter as discussed above, and also because (1) she was not

"congregat[ing] with other persons" (she was a journalist attempting to film the demonstration

and the arrest of the orator)[7]; (2) she did not receive a "lawful order" from Det. O'Donnell (she

_____

7 *See*, Higginbotham v. City of New York, et al., 2015 WL 2212242 at *2 (S.D.N.Y. May 12,

received a pre-textual order illegally telling her to get out of the roadway and to stop filming,
which was intended to – and did – prevent her from filming the arrest of the orator)[8]; and (3) she
did not refuse to comply with the unlawful order (she was in the process of complying with it, by
moving toward the sidewalk along with the police and the arrested orator, and trying to film the
orator's arrest in the process)[9].  Defendants seek to advance a pernicious argument that a police
officer can instruct a journalist to stop filming a newsworthy event, and that failure to comply
immediately with that order subjects the journalist to arrest and prosecution.  While that may the
state of the law in North Korea[10], it is not so in this country, which has robust protections of

---

2015) (Castel, J.) ("Because the defendants' order was directed at Higginbotham alone, it could
not be an order to disperse.").

8 See, *e.g.*,  People v. Benjamin, 185 Misc. 2d 466, 468-469 (Crim. Ct. Bronx County 2000):

> [N]ot every police instruction constitutes a "lawful" order to leave, and the circumstances
> justifying such an order must be examined ….
> ….
>
> Thus, it has been held that if the defendant's refusal to move on was orderly and quiet, or
> if the police officer's direction to move was arbitrary and unreasonable under the
> circumstances, the conviction will not stand. (See, People v Arko, 199 NYS 402, 405
> [App Term, 2d Dept 1922].) In People v Arko, the defendants were convicted of
> disorderly conduct for, inter alia, refusing to disperse when ordered by a police officer,
> while engaged in picketing on a public sidewalk. The court reversed the conviction,
> holding that, at times, refusal to comply with the direction of a police officer does not
> constitute disorderly conduct. The court reasoned, "Mere disobedience of an officer is not
> always an offense punishable by law, any more than his command is not always the law …
> The case must present proof of some definite and unmistakable misbehavior, which might
> stir, if allowed to go unchecked, the public to anger or invite dispute, or bring about a
> condition of unrest and create a disturbance." (Id., at 405.)

9 *See*, Higginbotham at * 3 ("There is nothing in the complaint to suggest that Higginbotham ever
"refused" to comply with the order, as required by the statute.").

10 *See*, e.g., City of Houston v. Hill, 482 U.S. 451, 461-463 (1987) ("The freedom of individuals
verbally to oppose or challenge police action without thereby risking arrest is one of the principal
characteristics by which we distinguish a free nation from a police state...").  While Hill addressed

13

individual and press rights under the First and Fourth Amendments at the core of its

jurisprudence.  *See*, Higginbotham v. City of New York, et al., 2015 WL 2212242 at *7-11 et

seq. (S.D.N.Y. May 12, 2015) (Castel, J.) (discussing the protected First Amendment status of

videotaping and holding that "the right to record police activity in public, at least in the case of a

journalist who is otherwise unconnected to the events recorded, was in fact 'clearly established' at

the time of the events alleged in the complaint.").

While Judge Castel did not need to reach the wider issue to decide the issue in

Higginbotham, Plaintiff submits that the law protecting the right to film police activity has long

been clearly established for anyone – journalist or non-journalist, and whether he or she is

involved or un-involved with the events being filmed – as has also long been recognized in the

NYPD's own administrative regulations.  AC ¶¶ 65-67.  This further renders the individual

defendants ineligible to assert the affirmative defense[11] of qualified immunity in this case[12].

The individual Defendants are further ineligible for qualified immunity in this case because

of their shocking and blatant perjury as to what Plaintiff had allegedly done, which indicates that

---

verbal challenges to police action, the same can certainly be said of the freedom to engage in
activity such as video-recording, which documents police conduct (and misconduct) and helps
thereby to increase police accountability (which, as in the instant case, the police often do not like,
and are motivated to, and do, attempt to prevent).

11 "Because qualified immunity is an affirmative defense ... the defendants bear the burden of
showing that the challenged act was objectively reasonable in light of the law existing at that
time."  Tellier v. Fields, 280 F.3d 69, 84 (2d Cir. 2000) (internal citation and quotation omitted).
*See also*, Palmer v. Richards, 364 F.3d 60, 67 (2d Cir. 2004).

12 *See, e.g.*, Groh v. Ramirez, 540 U.S. 551, 563-64 (2004) (no qualified immunity because "the
guidelines of petitioner's own department placed him on notice that he might be liable"); Wright
v. Smith, 21 F.3d 496, 500 (2d Cir. 1994) (no qualified immunity where New York State Code of
Rules and Regulations "gave the [defendant] officials clear notice" of liability).

they knew that what she had actually done was not remotely illegal.  Det. O'Donnell perjured

himself in the documents he submitted in support of Plaintiff's prosecution, by claiming that

Plaintiff had refused his direction to step out of the street, that Plaintiff pushed his arm when he

tried to separate Plaintiff from Defendant Bologna when Bologna was arresting the orator, and

that Plaintiff refused to put her arms behind her back, kicked her legs back and forth, wrapped her

arms around her body, and threw her arms up and down thereby making handcuffing difficult.

*See*, AC ¶¶ 52-64, 68-70.  And Defendant Bologna[13] perjured himself concerning both the

circumstances at the scene of Plaintiff's arrest, and concerning Plaintiff's alleged conduct prior to

her arrest, when he was deposed in another OWS civil rights action pending in this District.

Defendant Bologna gave testimony - that was both totally dishonest and totally deranged - that,

*inter alia*, the orator was by himself in traffic (with cars waiting patiently) and not joining

marchers who were proceeding on, and that when Bologna ordered and initiated the orator's

arrest, Plaintiff jumped on the orator to prevent the police from effecting his arrest.  AC ¶¶ 31-46.

The individual Defendants are ineligible to invoke the affirmative defense of qualified immunity in

this case since they violated clearly established law which required them to have probable cause

for their warrantless arrest of Plaintiff, and, as set forth in the detailed Amended Complaint, under

the facts of this case they were either "plainly incompetent" or "knowingly violated" the law,

neither of which, of course, can constitute the objectively reasonable mistake of law or fact

necessary to ground a qualified immunity defense.  *See*, Harlow v. Fitzgerald, 457 U.S. 800, 815

(1982) (no qualified immunity if defendant official "knew or reasonably should have known" his

_____

13 Defendant Bologna took ownership of Plaintiff's arrest, testifying that he had ordered it.  AC
¶¶ 31-32.

15

official actions "would violate the constitutional rights of the [plaintiff], or if he took the action

with the malicious intention to cause a deprivation of constitutional rights or other injury.") [14].  At

a minimum, it displays plain incompetence and indifference to Plaintiff's rights for members of the

police department to so blithely swear to facts as true that they either knew, or should have

known, were not true.  *See*, Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007)

("'Arguable' probable cause should not be misunderstood to mean 'almost' probable cause.") [15].

---

14 *See also,* Coggins v. Buonora, 776 F.3d 108, 114 (2d Cir. 2015) (re-affirming the principle
that falsification of evidence and related dishonest practices disqualify police defendants from
invoking the affirmative defense of qualified immunity.  "As the District Court properly
concluded, the alleged falsification of evidence and the related conspiracy, if true, constitute a
violation of clearly established law, and no objectively reasonable public official could have
thought otherwise."); Riccuti v. New York City Transit Authority, 124 F.3d 123, 130 (2d Cir.
1997) (qualified immunity not available where plaintiff alleged defendants intentionally fabricated
evidence against him); Lippay v. Christos, 996 F.2d 1490, 1504 (3d Cir. 1993) ("If a police
officer submits an affidavit containing statements he knows to be false or would know are false if
he had not recklessly disregarded the truth, the officer obviously failed to observe a right that was
clearly established. Thus, he is not entitled to qualified immunity.") (Internal citations omitted);
Hervey v. Estes, 65 F.3d 784, 788 (9th Cir.1995) ("In a civil rights case, if an officer submitted an
affidavit that contained statements he knew to be false or would have known were false had he
not recklessly disregarded the truth and no accurate information sufficient to constitute probable
cause attended the false statements ... he cannot be said to have acted in an objectively reasonable
manner, and the shield of qualified immunity is lost.") (Internal quotations and citations omitted);
Davis v. City of New York, 373 F.Supp.2d 322, 338 (S.D.N.Y. 2005) ("where, as here, there is a
question of fact as to whether defendants acted with malice in initiating a prosecution against
plaintiffs, summary judgment on qualified immunity is inappropriate.").

15 *See also*, Higginbotham v. City of New York, et al., 2015 WL 2212242 at *4 (S.D.N.Y. May
12, 2015) (Castel, J.) ("On a motion to dismiss, however, a qualified immunity defense based on
arguable probable cause faces a formidable hurdle … and is usually not successful." (internal
quotation omitted)); *See also*, Hershey v. Goldstein, 938 F.Supp.2d 491, 521 (S.D.N.Y. 2013)
(Englemayer, J.) ("[A] defendant presenting an immunity defense on a Rule 12(b)(6) motion
instead of a motion for summary judgment must accept the more stringent standard applicable to
this procedural route. Therefore, although possible, [u]sually, the defense of qualified immunity
cannot support the grant of a [Rule] 12(b)(6) motion for failure to state a claim upon which relief
can be granted.  Such is true here. At this early stage, it is premature to resolve defendants'
qualified immunity defense, because Hershey's allegations, on which defendants here must rely, do
not sufficiently support[] the defense .. on the face of the complaint."). (internal quotations and

If the Court decides to view the video footage Defendants submit in support of their motion, it will be immediately obvious that it is utterly impossible – under any potential interpretation of the footage – to conclude, *inter alia*, that Plaintiff kicked her legs back and forth, or that she wrapped her arms around her body or threw her arms up and down[16], or that the orator was alone in car traffic when he was arrested[17], or that Plaintiff jumped on the orator or on anyone else (AC ¶45).

Plaintiff's claim for First Amendment retaliation concerning her attempts to video-record the arrest of the orator cannot be decided on a motion to dismiss. *See*, e.g., <u>Bloch v. Ribar</u>, 156 F.3d 673, 682 (6th Cir. 1998):

> We also note that proof of an official's retaliatory intent rarely will be supported by direct evidence of such intent. *See McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979) (reversing the district court's dismissal of the plaintiff's claim, holding that it will often be difficult to support a claim requiring a showing of the defendant's state of mind with direct evidence in a complaint). Accordingly, "claims involving proof of a [defendant's] intent seldom lend themselves to summary disposition." See <u>Curtis v. Story</u>, 863 F.2d 47, 1988 WL 125361, at *3 (6th Cir. 1988).

In the instant case Plaintiff has amply pled (which is also plainly reflected on the video footage which Defendants seek to submit, should the Court choose to review it in connection with the motion) that Det. O'Donnell specifically focused on her, knew her name (and let it slip during his interactions with her), and both told her to stop filming and physically tried to block her from

---

citations omitted).

16 Indeed, it is clear that Det. O'Donnell and Officer Centenotalavera were holding – and were in complete control of – Plaintiff's arms at all points following her arrest.  AC ¶¶ 69-71.

17 The roadway was filled with numerous members of the NYPD, as well as numerous members of the public and journalists, including Plaintiff, who were watching and filming and / or photographing what was taking place. AC ¶ 12, 33-34.  And there were certainly no cars waiting patiently to proceed (although there was, apparently, as discussed above, a single U.S. Postal Service truck that was present for some reason on the closed Nassau Street roadway).

filming the arrest of the orator.  He may deny that this was his motivation (or that he was trying to do what he clearly was trying to do), but that determination will likely ultimately require a jury.[18]

The Obstruction of Governmental Administration statute, Penal Law § 195.05 also cannot be used as a justification for Plaintiff's arrest in this case.  The Amended Complaint is clear that Plaintiff did not refuse any direction given by Det. O'Donnell, was trying to comply with his illegal directive by walking toward the sidewalk, did not intend to, nor did she, obstruct or interfere with or exert any physical force upon the police or anyone else, or commit any unlawful acts, prior to her arrest, and did not push O'Donnell's arm or make other contact with him (and that he was the one who made the first contact with her, when he grabbed her and roughly arrested her in conjunction with Officer Centenotalavera).  AC ¶¶ 55-63.  Defendants – again relying upon the video evidence they seek to submit – argue that an officer bumped into her camera prior to the arrest (MOL p. 11).  But there is no indication at all that this incidental contact (which she, in any event, did not cause) interfered with or obstructed the arrest of the

---

18   Justice Black, in his concurrence in <u>Adickes v. Kress & Co.</u>, 398 U.S. 144, 176 (1970), explained why such fact-based inquiries should be left to a jury:

> The existence or nonexistence of a conspiracy [or a retaliatory motive] is essentially a factual issue that the jury, not the trial judge, should decide. In this case petitioner may have had to prove her case by impeaching the store's witnesses and appealing to the jury to disbelieve all that they said was true in the affidavits. The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment.

These principles apply *a fortiori* with regard to a motion to dismiss pursuant to Rule 12(b)(6) / 12(c), where discovery has not yet occurred and all inferences from the facts as alleged in the Amended Complaint must be drawn in favor of the non-moving party.

orator (or anything else) at all, in any way.  *See*, People v. Simon, 145 Misc. 2d 518, 522 (Crim.

Ct., Bronx County 1989):

> The court finds that the statute contemplates direct physical force or interference. While the infliction of physical injury is not required, it is essential that the alleged conduct physically interfere with the officer's official function. The requirement that the conduct be one of violence or physical interference or be independently unlawful was written into the statute to prevent this section from being an overly broad catchall for any behavior that might tangentially interfere with a government function.

Obstruction of Governmental Administration in the Second Degree (Penal Law § 195.05)

is a Class A (the most serious level) misdemeanor[19], and violation of the statute is punishable by

up to a year in jail.  It is a serious crime in the State of New York and - even more so than the

disorderly conduct statute - also has an important and stringent scienter requirement (which

requires intent, and not mere recklessness).  *See*, People v Dipoumbi, 23 Misc. 3d 1127[A] (Crim.

Ct., Bronx County 2009):

> The defendant contends that the accusatory instrument fails to establish reasonable cause to believe that he prevented or attempted to prevent the deponent police officer from performing an official function by means of intimidation, physical force or interference. This Court agrees.

> Presumably, the official function that the defendant allegedly prevented or tried to prevent the deponent police officer from performing was issuing a traffic summons to him for failing to obey a stop sign. The accusatory instrument does not allege that the officer was prevented from executing that task. Even if the officer did not issue the summons after his arm was struck by the taxicab's door when it was opened by the defendant a causal relationship between that impact and an unissued summons is not made out. There is no factual allegation that the officer was rendered physically unable to issue the summons after his arm was struck. Equally missing from the complaint is any factual basis from which to infer that the defendant opened the door and struck the officer for the purpose of preventing him from issuing the summons. Even if the defendant's alleged conduct could be viewed as negligent or reckless given the proximity of the officer to the taxicab,

---

19 Disorderly Conduct, in contrast, is classified as a non-criminal violation, and is punishable by up to 15 days in jail.

the statute requires that the defendant's act to have been purposeful. "One cannot attempt to commit an act which one does not intend to commit." <u>People v. Terry</u>, 104 AD2d 572, 479 N.Y.S.2d 278 (2d Dept 1984).

A reasonable officer would have clearly gleaned from Plaintiff's innocuous conduct in simply trying to film the orator's arrest as a journalist that she had no intent to interfere with or obstruct - and that she did not interfere with nor obstruct - anything the police were trying to do, including clearing the roadway that had been closed to vehicular traffic, or arresting the orator, or otherwise.  Plaintiff looked like a video-journalist simply trying to film[20] a newsworthy event, and acted like a journalist simply trying to film a newsworthy event.  There is no possible application of the Obstruction of Governmental Administration statute on Plaintiff's facts as pled in the Amended Complaint[21].

Because there was no probable cause to prosecute Plaintiff for Obstruction of Governmental Administration, and Plaintiff's prosecution was based upon Defendants' lies,

---

20 If the Court considers the Defendants' proffered video evidence, it will see that Plaintiff had a large, professional-grade video camera and a large equipment backpack on.  She looked like a journalist.  Plaintiff also has alleged that Det. O'Donnell knew exactly who she was (and inadvertently called her by her name prior to arresting her).

21 It is also well-established that Plaintiff - although she was trying to move to the sidewalk in compliance with Det. O'Donnell's directive in the course of their quick interactions - was not required to obey an illegal order (which Det. O'Donnell's directive to her was, since it apparently would have required her to stop filming the arrest of the orator), which would not constitute an authorized public function, and the Obstruction of Governmental Administration statute is inapplicable to Plaintiff's conduct for this reason as well.  <i>See, e.g.,</i> <u>People v. Lupinacci</u>, 595 N.Y.S.2d 76, 77 (2d Dept. 1993) ("[A] defendant may not be convicted of obstructing governmental administration or interfering with an officer in the performance of an official function unless it is established that the police were engaged in authorized conduct …."); <i>See also,</i> <u>Matter of Anthony B.</u>, 201 A.D.2d 725 (2d Dept. 1994); <u>People v. Greene</u>, 221 A.D.2d 559 (2d Dept. 1995); <u>People v. Vogel</u>, 116 Misc 2d 332 (App. Term, 2d Dept. 1994).

Plaintiff has also adequately pled a malicious prosecution claim concerning that charge.  Plaintiff was prosecuted on this false charge for six months (from September 25, 2011 to April 16, 2012) and it stands to reason that she was required to appear in Criminal Court in relation thereto over that period of time.  Burg v. Gosselin, 591 F.3d 95 (2d Cir. 2010) is inapposite, as that case did both did not involve a malicious prosecution claim, and also because it concerned the lack of a Fourth Amendment seizure stemming from the issuance of a non-custodial, pre-arraignment summons.  The Circuit has, additionally, questioned Burg's reasoning even in the context of a pre-arraignment appearance ticket, and explicitly held it to be inapplicable to a plaintiff – such as Plaintiff herein - who was required to appear in court in connection with criminal proceedings initiated by a defendant police officer.  See, Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013):

> The District Court relied on dictum in Burg v. Gosselin, 591 F.3d 95, 98 (2d Cir. 2010), to dismiss the malicious prosecution claim. However, there was no claim for malicious prosecution in Burg, see id. at 96 n. 3, the plaintiff having sought damages only for the issuance of a summons, see id. at 96. We ruled "that the issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure." Id. at 98. The plaintiff in Burg was required to appear in court only once. See id. We observed that "the number of [court] appearances may bear upon whether there was a seizure," adding in dictum, however, that "it is hard to see how multiple appearances required by a court, or for the convenience of the person answering the summons, can be attributed to the conduct of the officer who issues it." Id. Burg's dictum is questionable unless the multiple appearances were for the arrestee's convenience, but, in any event, we decline to apply that dictum to the different context of a plaintiff who was required to appear in court in connection with criminal proceedings initiated by the defendant police officer.

Lastly, the Obstruction of Governmental Administration charge was a completely separate charge from the Resisting Arrest and Disorderly Conduct charges, and thus a malicious prosecution claim can be brought for Plaintiff having been falsely charged with Obstruction of Governmental Administration.  See, Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991).  It is also

not relevant that Plaintiff would have had to appear in court anyway in relation to the charges for

which she received an Adjournment in Contemplation of Dismissal (ACD).  The ACD resulted in

a complete dismissal of those charges against her, and in no way is a finding or admission of any

sort of wrongdoing.  It is just not considered a favorable termination under New York law for

purposes of civil malicious prosecution claims for those charges.  The acceptance of an ACD as to

Charge A, however, does nothing whatsoever to invalidate a malicious prosecution claim

concerning Charge B, as to which there was a favorable termination.

D.     **Concerning Defendants' Remaining Arguments**

Plaintiff has adequately pled her claim for abuse of process, as she has pled that

Defendants targeted her and sought to retaliate against her for attempting to film the arrest of the

orator.  *See*, Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994) ("'collateral objective' includes

retribution"); *see also*, Phelps v. City of New York, 2006 U.S. Dist. LEXIS 42926, at *16

(S.D.N.Y. 2006) (Cote, J.) ("Officers who promote or facilitate an arrest and prosecution may be

liable for abuse of process….  Furthermore, the absence of probable cause is probative of the lack

of justification for the officers' actions and the existence of a collateral objective.") (internal

citation omitted).

Concerning Plaintiff's claims for excessive force, she has alleged that two powerful men,

much larger than her, grabbed her and took her roughly down to the ground[22], causing her to land

---

22 Defendants attempt to argue from their proffered video evidence that Plaintiff is seen
"dropping herself to the ground."  There is nothing remotely suggestive of that on the video,
which shows Defendants O'Donnell and Centenotalavera pushing her backwards and down to the
ground, where she lands on top of her large equipment bag, and Defendants – improperly using
the video on this motion in the first place – then compound that impropriety by interpreting what
is depicted in a manner that is decidedly in their favor, rather than in Plaintiff's favor, as is

on top of her large equipment bag, and then picked her up again and placed her in excessively and punitively tight handcuffs (concerning which she complained, and was ignored by Defendants). AC ¶¶ 23, 26-29. Plaintiff also alleges that she did not resist Defendants, and that the Defendants were so much larger and more powerful than her that they were able to (and did) move and manipulate all parts of her body with complete ease. AC ¶¶ 30, 71. Plaintiff's excessive force claims, both for being manhandled so roughly and unnecessarily, and concerning her handcuffing claims[23], have been sufficiently pled.

---

required on a motion to dismiss. Defendants continue to do this with regard to their further incredibly tendentious descriptions of what is depicted on the video footage, all of which are in dispute (*e.g.*, Plaintiff "fighting to keep her hands away;" Plaintiff "being calmly walked to a police vehicle;" Plaintiff "creeping behind police officers as they made an arrest, in defiance of a lawful order by Detective O'Donnell, and got so close that she pushed her camera into them while they made an arrest.") (MOL p. 19, 21).

23 . This court should hold that, as a matter of law, handcuffs should not be applied with unnecessary tightness, and that reasonable steps (in particular, loosening of overly tight handcuffs when such is feasible) should be taken in response to an arrestee's requests and complaints of pain from overly tight handcuffs. There is no binding law from the Second Circuit or the United States Supreme Court preventing this Court from so holding, and such a holding most comports with the meaning of the Fourth Amendment. *See*, Hershey v. Goldstein, 2013 U.S. Dist. LEXIS 51226 at *66 (S.D.N.Y. 2013) (Engelmayer, J.) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." Quoting Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987)). Judge Engelmayer continues:

> Although "a line of cases have held that minor injuries that result from tight handcuffs, such as temporary swelling, inflammation or soreness of an arrestee's wrists, are insufficient on their own to sustain a Fourth Amendment excessive force claim," Sullivan v. City of N.Y., No. 10 Civ. 0038 (NRB), 2011 U.S. Dist. LEXIS 96461, 2011 WL 3806006, at *4 (S.D.N.Y. Aug. 29, 2011), the case law also reflects that excessive handcuffing "may constitute use of excessive force," Dotson, 2012 U.S. Dist. LEXIS 41195, 2012 WL 996997, at *5(citing Kerman v. City of N.Y., 261 F.3d 229, 239-40 (2d Cir. 2001)); see also Robison, 821 F.2d at 924 (noting that a plaintiff can recover for damages for excessive handcuffing even if the injuries are not severe). Ultimately, "[l]ike all excessive force claims, the pivotal question is whether the officer[s'] behavior was objectively unreasonable in light of the circumstances." Dotson, 2012 U.S. Dist. LEXIS 41195, 2012 WL 996997, at *5.

Hershey at *67-68.

To the extent that Defendant Bologna ordered Plaintiff's arrest and was present for the application of force by Defendants O'Donnell and Centenotalavera but did not apply force himself, then he would be liable for failure to intervene and / or failure to remedy, especially as the ranking officer present on the scene.  To the extent that he physically participated in the handcuffing or other applications of force upon Plaintiff, then he would be directly liable for that excessive force that he personally participated in.  The details of what he did and did not do in the time between Plaintiff's arrest and her removal from the scene will be fleshed out in discovery (as it will with regard to the actions and omissions of Defendants O'Donnell and Centenotalavera, and the various other officers on the scene whose identities are presently unknown).

Plaintiff does not bring a state law conversion claim, but claims damage to her camera as one of the consequences of her false arrest.

Plaintiff has also properly pled her Monell claims, and set forth detailed facts concerning the City's long tolerance for officers' interference with and retaliation against those seeking to observe, photograph, and video-record police actions (AC ¶¶ 65-68, 84).  Plaintiff has also pled detailed facts concerning significant problems with the City's policies and practices concerning police officer dishonesty (AC ¶¶ 85-86), and concerning significant problems with the City's policies and practices relative to the NYPD's policing of the Occupy Wall Street (OWS) movement (AC ¶¶ 87-89), including a long (yet only partial) list of fifty-three[24] OWS-related civil rights cases that have been brought in this district, and a citation (and link to) a report - overwhelmingly concerning, and documenting, hundreds of instances of abuse by the NYPD in

---

24 This is hardly a "paltry" number, especially given the short duration of time between the birth and death of OWS, and the fact that many of the cases listed involved multiple plaintiffs.

24

relation to policing the OWS movement - compiled by The Global Justice Clinic at the New York

University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner

Center for International Law and Justice at Fordham Law School, entitled "Suppressing Protest:

Human Rights Violations in the U.S. Response to Occupy Wall Street," published July 25, 2012.

This more than adequately satisfies the pleading requirements for Monell claims.  *See,* Castilla v.

City of New York, 2011 U.S. Dist. LEXIS 95619 at *10 (S.D.N.Y. 2011) (Stein, J.):

> Taking plaintiffs' allegations as true, the Court finds that Castilla has sufficiently
> pled claims for Monell liability against the City of New York.
>
> This finding is based, in part, on the Second Circuit's recognition that "[it] is
> unlikely that a plaintiff would have information about the city's training programs
> or about the cause of the misconduct at the pleading stage, and therefore need only
> plead that the city's failure to train caused the constitutional violation." Amnesty
> Am. v. Town of West Hartford, 361 F.3d 113, 130 n. 10 (2d Cir. 2004). The
> Second Circuit has not yet addressed whether Iqbal has heightened the pleading
> requirements for such a municipal liability claim, but district courts in this Circuit
> have continued, post-Iqbal, to apply the pleading standard articulated in Amnesty
> to a Monell claim based on a failure to train. See Ferrari v. Cnty. of Suffolk, No.
> 10 Civ. 4218, 2011 WL 2297125, at *9 (E.D.N.Y. Jun. 7, 2011); Williams v. City
> of New York, 690 F. Supp. 2d 338, 346 (S.D.N.Y. 2010); Michael v. County of
> Nassau, No. 09 Civ. 5200, 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010).
> Thus, in assessing the sufficiency of plaintiff's Monell claims — particularly the
> failure to train claim — the Court keeps in mind that plaintiff has not yet had the
> full benefit of discovery.

This Court has also cited to the existence of a government report ("extensive portions of a letter

issued by the Department of Justice … describing the findings of an investigation of the

Westchester County Jail …") in denying a motion for summary judgment on a Monell claim in

Shepherd v. Powers, 55 F.Supp.3d 508, 516 (S.D.N.Y. 2014) (Swain, J.).  The same result is, *a

fortiori*, applicable on the instant motion to dismiss, where discovery has not yet been conducted.

**<u>CONCLUSION</u>**

For the forgoing reasons, the motion to dismiss should be denied in its entirety.


Dated:            New York, New York
                 June 26, 2015

                               _____/S/_____
                               JEFFREY A. ROTHMAN, Esq.
                               315 Broadway, Suite 200
                               New York, NY 10007
                               (212) 227-2980
                               Attorney for Plaintiff

26